UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| JOLENE WARD, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WEBULL CORPORATION, ANQUAN WANG, and H.C. WANG,<br><br>Defendants. | ) | Case No.<br><br>CLASS ACTION<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Jolene Ward ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Webull Corporation ("Webull", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Webull securities between April 26, 2025 and October 6, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Webull securities during the Class Period and was economically damaged thereby.

7. Defendant Webull is incorporated in the Cayman Islands. Its

principal executive offices in the United States are located at 200 Carillon Parkway, St. Petersburg, Florida 33716.

8. Webull describes itself as a broker-dealer regulated in 12 major markets globally, and states that its U.S. broker-dealer is Webull Financial LLC ("Webull Financial").

9. The Company's Class A ordinary shares trade on The Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "BULL." The Company's redeemable warrants trade on the NASDAQ under the ticker symbol "BULLW."

10. On April 11, 2025, Webull's Class A ordinary shares began trading on the NASDAQ following the completion of the Company's business combination with SK Growth Opportunities Corporation, a special purpose acquisition company.

11. Defendant Anquan Wang ("A. Wang") is Webull's founder and has served as Webull's Chief Executive Officer ("CEO") and Chairman of the Board of Directors at all relevant times. Defendant A. Wang is a citizen of the People's Republic of China ("PRC") and, as of March 31, 2026, beneficially owned 16.4% of Webull's outstanding ordinary shares, representing 79.2% of Webull's total voting power.

12. Defendant H.C. Wang has served as Webull's Chief Financial Officer ("CFO") since February 2021 and as a director since August 2022.

13. Defendants A. Wang and H.C. Wang are collectively referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. Webull is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles

of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17. Webull and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18. On April 25, 2025, Webull filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2024 (the "2024 Annual Report").

19. The 2024 Annual Report stated, in pertinent part, the following:

> We believe that we do not fall within the scope of these or other laws, rules, or regulations targeting companies with connections to China. This view is based primarily on the facts that (1) we are regulated as broker-dealers in 12 major markets globally; ***(2) our principal business operations are based in the U.S.;*** (3) of the six members of our current board of directors and senior management teams, five are U.S. citizens and based in the U.S. (namely Messrs. Denier, H.C. Wang, James, Lu, and Ms. Adams); (4) our auditor, KPMG LLP ("KPMG"), is based in the U.S.; ***(5) all of the personally identifiable information of the customers of Webull Financial, our U.S. broker-dealer, is stored in servers located in the United States and cannot be transmitted outside of the United States or accessed by our non-U.S. employees without permission and oversight from our U.S. personnel; and (6) our operations in mainland China are limited to research and development and technical support functions.***

***

> We have also been the subject of inquiries and investigations from various government bodies in the United States relating to concerns about our connections to China. For example, in April 2024, the attorneys general from 14 different U.S. states posted a letter on a social media platform in which they raised concerns about our treatment of the sensitive personal and financial data and alleged that such data could potentially be exposed to the Chinese Communist Party, or CCP. Further, on December 5, 2024, the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party of the U.S. House of Representatives (the "Select Committee") delivered a letter to the chief executive officer of Webull Financial requesting information concerning the relationship between Webull Financial and our operations in China, and the security of sensitive customer data. ***We believe the claims and allegations in both letters were largely based on outdated and inaccurate information about us,*** and we are cooperating with both the state attorneys general and the Select Committee to address the concerns raised in their respective letters. However, we cannot be certain that we will be able to resolve all of their concerns and that the result of their inquiries will not lead to further action on their part, which may materially and adversely affect our business, financial condition, and results of operations.

20. The statements in ¶ 19 were false and/or misleading at the time they were made because: (1) Defendants represented that Webull's operations in mainland China were "limited to research and development and technical support functions," when in truth Webull's core platform, software development, data pipelines, and core engineering depended on PRC-based personnel and on technology infrastructure subject to Chinese law; (2) Defendants represented that the personally identifiable information of Webull Financial's customers could not

be accessed by non-U.S. employees without permission and oversight from U.S. personnel, while concealing that Webull's technology infrastructure and cross-border data routing were tied to China; (3) Defendants represented that Webull's principal business operations were based in the U.S., when Webull's ownership structure, technical workforce, technology infrastructure, financing, and compliance structure were structurally tied to China; (4) Defendants dismissed the Select Committee's claims and allegations as "largely based on outdated and inaccurate information," when the Select Committee's concerns regarding the relationship between Webull Financial and Webull's operations in China and the security of sensitive customer data were well founded, as the Select Committee later reported; and (5) as a result, Defendants materially understated Webull's operational dependence on the PRC and the regulatory risk arising from that dependence.

21. On July 18, 2025, Webull filed with the SEC a registration statement on Form F-1 (the "Registration Statement"), which stated, in pertinent part, the following:

> We believe that we do not fall within the scope of these or other laws, rules, or regulations targeting companies with connections to China. This view is based primarily on the facts that (1) we are regulated as broker-dealers in 12 major markets globally; ***(2) our principal business operations are based in the U.S.;*** (3) of the six members of our current board of directors and senior management teams, four are U.S. citizens and based in the U.S. (namely Messrs. Denier, H.C. Wang,

> James, Lu, and Mr. Bishop); (4) our auditor, KPMG LLP ("KPMG"), is based in the U.S.; ***(5) all of the personally identifiable information of the customers of Webull Financial, our U.S. broker-dealer, is stored in servers located in the United States and cannot be transmitted outside of the United States or accessed by our non-U.S. employees without permission and oversight from our U.S. personnel; and (6) our operations in mainland China are limited to research and development and technical support functions.*** However, our founder and chief executive officer, Mr. Anquan Wang, is a citizen of the People's Republic of China, owns approximately 17.1% of the outstanding Webull Ordinary Shares and all of the outstanding Webull Class B Ordinary Shares, representing approximately 80.5% of Webull's total voting power as of the date of this prospectus. In addition, our mainland China subsidiary, Hunan Weibu Information Technology Co., Ltd., employs 731 employees, representing 61% of our employees as of December 31, 2024, and is subject to the jurisdiction of the People's Republic of China.

22. The statements in ¶ 21 were false and/or misleading at the time they were made because: (1) Webull's operations in mainland China were not "limited to research and development and technical support functions," as Webull's core platform, software development, data pipelines, and core engineering depended on PRC-based personnel and on technology infrastructure subject to Chinese law; (2) Webull's technology infrastructure and cross-border data routing were tied to China, such that Defendants' assurances that Webull Financial's customer data was insulated from non-U.S. access were misleading; (3) Webull's ownership structure, technical workforce, technology infrastructure, financing, and compliance structure were structurally tied to China, contrary to Defendants' representation that Webull's principal business operations were based in the U.S.;

and (4) as a result, Defendants materially understated Webull's operational dependence on the PRC and the regulatory risk arising from that dependence.

23. On April 9, 2026, Webull filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2025 (the "2025 Annual Report"), which stated, in pertinent part, the following:

> We believe that we do not fall within the scope of these or other laws, rules, or regulations targeting companies with connections to China. This view is based primarily on the facts that (1) we are regulated as broker-dealers in 12 major markets globally; ***(2) our principal business operations are based in the U.S.;*** (3) of the six members of our current board of directors and senior management teams, five are U.S. citizens and based in the U.S. (namely Messrs. Denier, H.C. Wang, James, Houlihan, and Bishop); (4) our auditor, KPMG LLP, is based in the U.S.; ***(5) all of the personally identifiable information of the customers of Webull Financial, our U.S. broker-dealer, is stored in servers located in the United States and cannot be transmitted outside of the United States or accessed by our non-U.S. employees without permission and oversight from our U.S. personnel; and (6) our operations in mainland China are limited to research and development and technical support functions.***
>
> ***
>
> . . . Further, on December 5, 2024, the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party of the U.S. House of Representatives (the "Select Committee") delivered a letter to the chief executive officer of Webull Financial requesting information concerning the relationship between Webull Financial and our operations in China, and the security of sensitive customer data. ***We believe the claims and allegations in both letters were largely based on outdated and inaccurate information about us,*** and we are cooperating with both the state attorneys general and the Select Committee to address the concerns raised in their respective letters.

24. The statements in ¶ 23 were false and/or misleading at the time they were made because: (1) Webull's operations in mainland China were not "limited to research and development and technical support functions," as Webull's core platform, software development, data pipelines, and core engineering depended on PRC-based personnel and on technology infrastructure subject to Chinese law; (2) Webull's technology infrastructure and cross-border data routing were tied to China, such that Defendants' assurances that Webull Financial's customer data was insulated from non-U.S. access were misleading; (3) Webull's ownership structure, technical workforce, technology infrastructure, financing, and compliance structure were structurally tied to China, contrary to Defendants' representation that Webull's principal business operations were based in the U.S.; (4) Defendants dismissed the Select Committee's claims and allegations as "largely based on outdated and inaccurate information," when those concerns were well founded; and (5) as a result, Defendants materially understated Webull's operational dependence on the PRC and the regulatory risk arising from that dependence.

25. The statements contained in ¶¶ 19, 21, and 23 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Webull's mainland China operations were not limited to research and development and technical support functions, but rather Webull's software development, data pipelines, and core engineering depended on PRC-based personnel and on infrastructure subject to Chinese law; (2) Webull's ownership structure, technical workforce, technology infrastructure, cross-border data routing, financing, and compliance structure were structurally tied to China; (3) as a result, Webull's representations that its principal business operations were based in the U.S. and that its U.S. customer data was insulated from non-U.S. access materially overstated the Company's independence from the PRC; and (4) as a result, Defendants' statements about Webull's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

26. On October 7, 2026, before the markets opened, CNBC reported that the Select Committee had found a "profound gap" between Webull's presentation of itself as an American company and its actual control and operations.

27. According to the report, the Select Committee found that "Webull's ownership architecture, technical workforce, technology infrastructure, cross-border data routing, corporate financing, and compliance frameworks are tied in

structural ways to the People's Republic of China."

28. The Select Committee also reportedly found that Webull initially told the Select Committee that it had no offices or employees in China, while Webull's mainland China subsidiary in fact employed approximately 863 employees, or 62% of Webull's global workforce.

29. On this news, Webull's Class A ordinary shares fell $1.39 per share, or approximately 19%, to close at $5.89 per share on October 7, 2026, on unusually heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

30. Defendant A. Wang founded Webull, has served as its CEO and Chairman at all relevant times, and controls approximately 79.2% of Webull's total voting power. As Webull's founder and controlling shareholder, Defendant A. Wang knew or recklessly disregarded the extent to which Webull's core engineering, data infrastructure, and technical workforce were located in and dependent upon the PRC.

31. Webull's mainland China subsidiary, Hunan Weibu Information Technology Co., Ltd., employed 863 employees, representing 62% of Webull's employees as of December 31, 2025. The location and function of the majority of the Company's workforce, and the infrastructure on which its core platform depended, concerned Webull's core operations and were necessarily known to the

Individual Defendants.

32. Defendants were on notice of the precise subject of the alleged misstatements throughout the Class Period. Webull itself disclosed that, on December 5, 2024, the Select Committee delivered a letter to the chief executive officer of Webull Financial requesting information concerning the relationship between Webull Financial and Webull's operations in China, and the security of sensitive customer data, and that Webull was cooperating with the Select Committee.

33. Moreover, the Select Committee found that Webull initially told the Select Committee that it had no offices or employees in China.

34. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Webull securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation

make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

42. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

44. Plaintiff repeats and realleges the allegations contained in paragraphs ¶¶18-25, 26-29, & 30-34 as if fully set forth herein..

45. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

48. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These

defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

49. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

50. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

51. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

52. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

54. Plaintiff repeats and realleges the allegations contained in paragraphs ¶¶11-16 as if fully set forth herein.

55. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's business practices.

56. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

57. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

58. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 8, 2026

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen, Esq.
Fla. Bar No. 0182877
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*